# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEMETRIUS M. BOYD,**

    **Plaintiff,**

  v.                                                                      **Case No. 13-CV-94**

**LT. SCHNEIDER,**
**CO DEREK SCHOUTEN,**
**CO ROZONI, and**
**CO KAPHINGST,**

    **Defendants.**[1]

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Demetrius M. Boyd ("Boyd"), a Wisconsin state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging an Eighth Amendment excessive force claim against defendants CO Derek Schouten, CO Budler-Ronzoni, and CO Kaphingst, and an Eighth Amendment failure to intervene, conditions of confinement, and medical care claims against defendant Lt. Schneider. The parties cross-moved for summary judgment.[2] For the reasons I explain in this opinion, I will deny the plaintiff's motions for summary judgment and grant the defendants' motion for summary judgment.

---

[1] Defendant CO Rozoni is identified as Edward Budler-Ronzoni in his summary judgment affidavit. The Court will therefore refer to him as defendant Budler-Ronzoni.

[2] The plaintiff filed two motions for summary judgment. His first motion consists of a combined motion/brief/proposed findings of facts document and affidavits from inmates Ronnie Quinn and Clyde Scott (Docket ## 25-28). His second summary judgment motion consists of a combined motion/brief document and his own affidavit (Docket ## 32-33). The plaintiff's summary judgment motions are complementary and the Court will not distinguish between them in this Decision and Order.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## UNDISPUTED FACTS[3]

Boyd was an inmate at Waupun Correctional Institution ("WCI") at all times relevant. He claims that defendants Schouten, Budler-Ronzoni, and Kaphingst used excessive force on him based on their alleged treatment of his arm on November 27, 2012. Boyd also claims that defendant Schneider failed to intervene in the use of excessive force and subsequently placed him on controlled segregation status instead of providing medical care for his injuries. The defendants are employed by the Wisconsin Department of Corrections at WCI. Defendant Schneider is a supervising officer I (lieutenant), defendant Schouten and Kaphingst are correctional officers, and defendant Budler-Ronzoni is a correctional officer II.

Boyd was housed in cell A-204, a controlled segregation cell, at all times relevant. Controlled segregation is a status with limitations on property and activities, to be used when it is difficult to control an inmate who is already in segregation. "A security supervisor may order into controlled segregation any inmate in segregated status who exhibits disruptive or destructive behavior." Wis. Admin. Code § DOC 303.71(1). Boyd had been housed in cell A-204 since October 29, 2012.

*1. The November 27 Incident*

On November 27, 2012, defendants Budler-Ronzoni and Schouten were segregation officers assigned to escort inmates to and from the showers. They escorted Boyd to the shower area, which

---

[3] Relevant, undisputed facts are taken from the Defendants' Proposed Findings of Fact, the plaintiff's Proposed Findings of Fact, and the plaintiff's supporting affidavits. Facts are also taken from the plaintiff's sworn complaint. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).

The plaintiff's proposed facts do not cite to the record. However, the document is sworn, *see* 28 U.S.C. § 1746, and the Court construes the filing as an affidavit to the extent that the statements comply with Federal Rule of Civil Procedure 56(c)(4). Finally, the plaintiff's response to the defendants' proposed findings of fact does not cite to the record. Thus, unless otherwise indicated, the Court has not considered the filing. *See* Fed. R. Civ. P. 56(c)(1).

consists of three shower stalls in a row, each with a mesh door. The officers directed Boyd to go into shower stall number two, but he stopped in front of an adjacent stall. Boyd did not want to shower in stall two because the inmate in stall one threatened to throw bodily fluids at him. He requested to have his shower in stall three but defendants Budler-Ronzoni and Schouten denied his request. They again informed Boyd that they were placing him in stall two, but Boyd requested to be returned to his cell. When an inmate requests to be taken back to his cell before showering, it is considered a refusal to shower.

When defendants Schouten and Budler-Ronzoni arrived at Boyd's cell door, a long tether strap was placed around his left wrist securing him to the door. Defendant Schouten directed Boyd to kneel down on the towel so he could remove his leg restraints. Boyd refused. Defendant Schouten told Boyd he was giving him a direct order to kneel so his leg restraints could be removed, but he refused again. Defendant Schouten radioed a Sergeant Schmidt and told him to report in person to cell A-204.

Defendant Kaphingst was assigned as a program escort officer in the segregation unit when he heard a call over the radio for Sergeant Schmidt to report to cell A-204. He immediately responded to the area and observed Boyd standing at his cell door with his hands cuffed behind his back, leg restraints on his ankles, and a long tether strap on his left wrist which secured him to his cell door. Defendant Kaphingst observed defendants Schouten and Budler-Ronzoni securing Boyd's arms. When defendant Kaphingst arrived, he asked Boyd what was going on. Boyd immediately started swearing at him and telling him that he was not the sergeant and to "shut my bitch ass mouth." Defendant Kaphingst stopped speaking to Boyd because Boyd was agitated and very upset, and because he had a history of being assaultive towards staff.

At approximately 8:30 a.m., defendant Schneider responded to a radio call for the sergeant to report in person to cell A-204. Defendant Schouten explained to defendant Schneider that Boyd refused his directives. While defendants Budler-Ronzoni and Schouten secured Boys's arms, Boyd told defendant Schneider he was denied a shower due to defendants Budler-Ronzoni and Schouten not placing him in the shower stall he wanted. Defendant Schneider verbally directed Boyd to comply with staff directives to kneel down so the leg restraints could be removed. Boyd followed defendant Schneider's directive and knelt down.

After the leg restraints were removed, Boyd stepped into his cell and the cell door was closed. He placed his arms out of the cell door trap so his handcuffs could be removed. Defendant Schouten directed Boyd to keep his hands outside the trap until the handcuffs were removed. Defendant Kaphingst secured Boyd's left arm and defendant Schouten secured his right arm with an escort hold. An escort hold is used by staff to secure an inmate's arm and/or hand and is used from the time restraints are applied, during escort, and as restraints are removed.

The parties dispute what happened next. According to the defendants, after the handcuff was removed from Boyd's right wrist, he violently and forcefully pulled his right arm from defendant Schouten's escort hold and into his cell, which was against Schouten's verbal directive. Defendant Schouten continued to try to secure Boyd's hand to not allow him to pull it in through the trap, but he was unsuccessful; Boyd pulled his right hand through the trap and into his cell. It appeared that defendant Schouten's arm was yanked into Boyd's cell because he was still holding onto Boyd's right wrist. Due to his assaultive history towards staff and a history of spitting on staff, defendant Kaphingst applied a compliance hold to Boyd's left wrist securing his left arm and stated, "stop resisting." A compliance hold is a technique used to bring a person back under control and is used

when an inmate is resistive. Defendant Kaphingst applied the compliance hold in an effort to prevent the plaintiff from turning and facing staff.

Boyd, on the other hand, avers:

> When defendant Budler-Ronzoni uncuffed my right hand I did what I normally do and pulled my hand into the trap. As soon as this was done defendant Kaphingst pulled my left arm out of the trap with a very violent[ ] yank[,] you would have thought Kaphingst was trying to start up a chainsaw if you have seen him. Once defendants Budler-Ronzoni and Schouten saw my left arm fully extended out of the cell door trap they looked like a pack of wolves.
>
> I could feel my left arm being palpitated and hear the defendants grunt there [sic] satisfaction under there [sic] breath. My left arm was still handcuffed to the cell door so even if I wanted to pull my left arm into the cell I wouldn't [have] been able to do anything or go anywhere because I was still secured to the cell door. I had no weapons in my hand or in my possession. I had not made any threats to harm staff, other inmates, nor myself.
>
> I did not try to grab any of the defendants. If the defendants would have not pulled my arm out of the trap I would not have been injured. My left arm was injured by defendants Kaphingst, Schouten, and Budler-Ronzoni when it was pulled out of the cell trap door.

(Compl. at 5-6.) Boyd further avers that defendants Schouten, Kaphingst, and Budler-Ronzoni inflicted pain and caused injuries to his left wrist and arm while defendant Schneider stood by and watched. (Pl.'s Proposed Finding of Fact No. 2; *see also* Quinn Aff. ¶¶ 3-4; Scott Aff. ¶¶ 3-4.)

Staff members and defendant Schneider assisted defendant Kaphingst in securing the plaintiff's left arm. During this attempt, the long tether strap that was securing his left arm snapped at the cuff, freeing his arm.[4] Boyd was given several verbal directives to stop resisting and to stop trying to pull his left arm into his cell.

---

4   Inmates Quinn and Scott aver that Boyd did not break the tether strap, that they did not see or hear the strap break, and that they did not notice the defendants call for another strap. However, this dispute is immaterial.

During this altercation, Boyd received a scratch on his left forearm and blood was observed around the wound. Defendant Schmidt relieved defendant Schouten so he could put protective gloves on. Boyd demanded to see a nurse. Defendant Kaphingst requested a towel to cover Boyd's wound in an attempt to reduce the possibility of the blood transferring to staff. Defendant Schneider verbally directed him to place his right arm out of the trap so he could be restrained and taken to the strip cell where he could receive medical attention.

Another long strap was placed onto Boyd's left wrist to secure him to the cell door. Defendant Schneider gave Boyd several more verbal directives to place his right arm out of the trap to be restrained so he could be removed from his cell. Boyd claimed he could not get his right arm out of the trap due to staff securing his left arm out of the trap. Staff informed him they would work with him while still securing his left arm so he would be able to comply and place his right arm out of the trap. Boyd refused to comply with the verbal directives even though staff offered to work with him to allow more room for him to place his unsecured right hand out of the trap to be restrained.

Per defendant Schneider's directive, defendant Schouten obtained the X-26 Taser. Defendant Schouten gave defendant Schneider the Taser and assisted in securing Boyd's left arm. Defendant Schneider then told Boyd he had the X-26 Taser and he showed it to him. Defendant Schneider told Boyd to place his right hand out of the trap so staff could apply restraints. The X-26 Taser is an electronic control device and it is shown to inmates when an inmate's behavior and failure to follow directives creates situations where safety is at risk. It is used to gain compliance when an inmate continues to resist staff and fails to comply with directives. Upon seeing the X-26 Taser, Boyd complied with directives and placed his right hand out of the trap. Staff opened the cell door upon restraining the plaintiff and he stepped out.

Boyd refused to kneel on the bare floor so defendant Schneider retrieved a towel and placed it on the floor. He then complied with directives to kneel and leg restraints were applied to his ankles. Due to Boyd's history of spitting on staff, a spit hood was placed over his head and he was escorted to strip cell #2. Defendant Budler-Ronzoni remained at cell A-204 and emptied it of all of Boyd's belongings because he was going into control status and he was not allowed to have personal property due to his assaultive behavior and agitated state.

At strip cell #2, Boyd's clothes were removed with dura shears and defendant Kaphingst conducted a staff assisted strip search to ensure that he did not have any contraband before being placed in controlled segregation. During the strip search, defendant Kaphingst removed Boyd's spit mask and directed him to open his mouth to search for contraband, which is routine during a strip search. Boyd refused to comply. Defendant Schneider presented the X-26 Taser to Boyd and he complied with all remaining directives during the strip search. The search yielded no contraband. Upon completion of the strip search, staff placed a towel around Boyd's waist for privacy.

Nurse Ann Slinger was called to the segregation unit to check Boyd for injuries. She provided medical attention to him while he was standing at the strip cell. In the medical record, Nurse Slinger noted that Boyd complained of left wrist and hand pain and left forearm pain. She further noted that, upon examination, Boyd had left forearm pain from abrasions and left hand and wrist pain. He stated that security bent his wrist back and he felt a "pop." Nurse Slinger documented that Boyd had abrasions on several large areas lateral and posterior over his left forearm with an open area on his posterior forearm. She measured the wound area as approximately 2.5 cm long x .5 cm wide x .1 cm deep. Based upon her examination notes, Boyd complained of numbness and pain along the left thumb and wrist area, but his mobility was good. He gave a weak hand grasp, his pulse was present, his left radial hand fingers were warm, and Nurse Slinger noted no gross deformities to his left hand

or wrist. No swelling was present. Boyd was wearing handcuffs and he had cuffs on his ankles. Nurse Slinger noted there was potential for infection due to open abrasions on his left forearm and alteration in comfort related to left wrist pain secondary to injury. She cleaned Boyd's left forearm wounds with hydrogen peroxide and normal saline to help prevent infection. She then applied Bacitracin, an antibiotic ointment used to prevent infection, and a large bandage over the wound. At approximately 8:50 a.m., Nurse Slinger administered Ibuprofen 800 mg. and Tylenol 650 mg. for pain. She noted Boyd was not allowed to have ice due to his placement in control status. Nurse Slinger informed him that swelling and pain will occur after a musculoskeletal injury and advised him to take his pain medications.

The WCI physician was updated on Boyd's assessment and pain, and a nursing follow-up was scheduled for the following day. Boyd demanded further medical attention and x-rays and threatened staff that he would sue them if they did not comply with his demands. Because there was also a staff injury involving an open wound, which was deemed a significant exposure by Waupun Memorial Hospital, the physician at WCI ordered a blood draw for testing. The progress note from November 27, 2012 indicates labs were drawn and transported to Waupun Memorial Hospital. It further notes that K. DeYoung, RN, received verbal consent from Boyd for the blood draw and to disclose the results.

On November 28, 2012, Boyd submitted a Health Services Request ("HSR") to the Health Services Unit ("HSU") requesting treatment for left arm injuries he sustained the previous day. He indicated that his left wrist was slightly larger than his right wrist and his arm was sore and the wounds burned. That day, Nurse DeYoung reported to the plaintiff's cell to conduct a follow-up examination of his left forearm injuries. Boyd refused to come out of his cell so he was seen at his door. Nurse DeYoung noted Boyd offered no complaints of wrist pain or numbness secondary to the

injuries he received on November 27, 2012. She noted that his wounds were healing well and there were no signs or symptoms of infection. Nurse DeYoung informed Boyd that he should submit an HSR if he experienced any changes in his condition. Additionally, Nurse DeYoung discussed signs and symptoms of infection with Boyd, and he voiced understanding of the information.

On November 29, 2012, Boyd submitted an HSR requesting a progress healing record on his injury. Boyd was informed he could do a review of records and document whatever he would like. On December 2, 2012, he submitted an HSR requesting measurements of the injuries he sustained to his left arm on November 27, 2012. Boyd indicated he would need to provide the inmate complaint examiner and the Court with an exact measurement of the injuries.

On December 4, 2012, Boyd was seen for sores inside his mouth. It is noted that during the appointment, he requested to have a scar on his left arm measured. The nurse noted the abrasion was almost healed and it was approximately 6"x 2 1/2". The nurse noted that there was no scar present. Later that day, he submitted another HSR noting that the nurse measured the injuries he sustained on November 27, 2012. He noted the nurse measured a 6" x 2" scar with three consecutive scars each about three inches long and one inch wide. Boyd was informed he could review his record and request copies at his medical record review. Medical rounds were conducted on December 4, 10, and 21, 2012, and during those rounds Boyd was responsive and had no complaints.

*2. Boyd's Placement Into Control Status*

After Nurse Slinger assessed Boyd, he was escorted back to cell A-204 where he was placed in control segregation with a security smock and security mattress. Defendant Kaphingst took a photograph of the Boyd's wound on his left forearm. (Kaphingst Aff. ¶ 31, Ex. 107.)

Defendant Schneider, as a supervising officer, has the authority to place inmates in controlled segregation. He approved Boyd's placement in controlled segregation based on resistance towards

- 10 -

staff and for disobeying staff directives. The institution is required to provide adequate necessities to an inmate in controlled segregation such as adequate clothing, essential hygiene supplies, and adequate meals. *See* Wis. Admin. Code § DOC 303.71. However, security is responsible for maintaining close control of all property. Defendant Schneider makes decisions about whether an inmate can have clothing or bedding in their cell. While an inmate is in controlled segregation and remains disruptive, it is necessary to maintain close control of all property items. If an inmate was given clothes, a blanket, or other property while in an agitated state, there is a high potential for the inmate to continue disruptive behavior and use items to block the cell door window, limiting staff's ability to monitor the inmate.

Boyd alleges that while in controlled segregation, he was denied property, hygiene, clothes, bedding, and shoes. Due to his assaultive behavior and agitated state, defendant Schneider felt Boyd was posing a potentially dangerous threat to himself or others, so he was only provided a smock and mattress.

Boyd alleges that he was denied meals while in controlled segregation. Defendant Schneider reviewed Boyd's Observation of Offender record for November 27, 2012, which documents staff members' observations of him in controlled segregation. That record shows that at approximately 10:30 a.m., Officer Ross gave Boyd a meal, which would have been lunch. Because he was in controlled segregation, he would have been given a nutraloaf. A nutraloaf is a nutritionally complete meal in the shape of a loaf and is given to inmates who are in controlled segregation. It was Boyd's choice whether or not to eat the meal. He was removed from controlled segregation at 3:04 p.m. Boyd's clothing and personal items were returned to him at the end of his control placement.

Boyd alleges that his cell was severely cold and dirty, but he never complained to defendant Schneider that his cell was cold or dirty. He had been housed in cell A-204 since October 29, 2012.

The cleanliness of his cell was as he left it and he never made any prior complaints about the temperature or cleanliness. In addition, defendant Schneider reviewed the temperature logs from October 29, 2012 through November 27, 2012, which shows the temperatures applicable to cell A-204 in controlled segregation. Between October 29, 2012 and November 27, 2012, the temperature for A-204 was always between 69.91 and 79.18 degrees Fahrenheit. On November 27, 2012, when Boyd was in controlled segregation, the temperature ranged between 69.91 and 72.77 degrees Fahrenheit.

As a result of this incident, Boyd was only in controlled segregation from approximately 8:30 a.m. to 3:04 p.m. on November 27, 2012. At 3:00 p.m., Officer Vanderbush observed Boyd standing at his door and noted that he stated he was fine.

Boyd further alleges that defendant Schneider placed him in control status instead of giving him medical attention. At approximately 8:35 a.m. on November 27, 2012, Boyd was seen and provided medical attention by Nurse Slinger.

    *3.*       *The Conduct Report and Discipline History*

As a result of the incident on November 27, 2012, Boyd received Conduct Report 234866 for violating Wis. Admin. Code § DOC 303.24, Disobeying Orders; and DOC 303.12, Battery. (Ray Affidavit, p. 2, ¶ 5, Ex. 109.) He received a disposition of 360 days disciplinary separation, the maximum amount that can be given as a disposition, as a result of his conduct that is described in the conduct report. The plaintiff received that disposition because battery causes a risk of serious disruption and creates a risk of serious injuries. Also, disobeying orders erodes staff's authority and causes a risk of serious disruption within an institution.

Boyd has a history of being assaultive and disrespectful towards staff. In 2012, he received the following conduct reports and dispositions:

| Conduct Report | Rule Violation | Disposition |
|---|---|---|
| 2287413 | DOC 303.16 – Threats<br>DOC 303.25 - Disrespect | 180 days disciplinary separation |
| 2303684 | DOC 303.24 – Disobeying Orders | 90 days disciplinary separation |
| 2150090 | DOC 303.15 – Sexual Conduct | 90 days disciplinary separation |
| 2303932 | DOC 303.28 – Disruptive Conduct<br>DOC 303.25 – Disrespect | 300 days disciplinary separation |
| 2313016 | DOC 303.16 – Threats<br>DOC 303.25 – Disrespect | 180 days disciplinary separation |
| 2313093 | DOC 303.24 – Disobeying orders<br>DOC 303.63 – Violation of Institution Policy and Procedures | 30 days loss of recreation |
| 2343880 | DOC 303.24 – Disobeying Orders | 90 days disciplinary separation |
| 2343866 | DOC 303.12 – Battery<br>DOC 303.24 – Disobeying Orders | 360 days disciplinary separation; dispose of contraband |
| 2343830 | DOC 303.16 – Threats<br>DOC 303.25 – Disrespect | 180 days disciplinary separation |

## DISCUSSION

As stated earlier, the parties have cross-moved for summary judgment. The defendants contend that Boyd's excessive force and failure to intervene claims must fail because defendants Schouten, Budler-Ronzoni, and Kaphingst did not use excessive force against the plaintiff. They also contend that Boyd was not placed in unconstitutional conditions of confinement while in controlled segregation status. Lastly, the defendants contend that Boyd's medical care claim must fail because he was provided appropriate medical care after the incident.

Boyd contends that he is entitled to summary judgment on his excessive force and failure to intervene claims because defendants Schouten, Budler-Ronzoni, and Kaphingst battered his left arm

while defendant Schneider stood by and watched. He also contends that he is entitled to summary judgment on his conditions of confinement claim.[5] I will address each claim in turn.

   *1.   Excessive Force and Failure to Intervene Claims*

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). Factors in determining whether the use of force was wanton and unnecessary include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Often circumstances require prison officials to balance the need "to maintain or restore discipline" using force at the risk of injury to inmates. *Hudson*, 503 U.S. at 6. Both situations require officials to act quickly and decisively. *Id.* Likewise, both implicate the principle that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal citations and quotations omitted).

In this case, Boyd claims that defendants Schouten, Kaphingst, and Budler-Ronzoni used excessive force and injured his arm during the incident on October 27, 2012. He asserts that they

---

[5] Boyd's summary judgment brief and proposed facts include arguments regarding the strip search that was conducted before he was placed in controlled segregation. However, Boyd is not proceeding on a claim based on the strip search.

- 14 -

looked like a pack of wolves and that he could feel his arm being palpitated while the officers grunted their satisfaction. Boyd's left arm was injured during the incident and he required medical attention including cleansing, application of antibiotic ointment, a bandage, and pain medication. However, despite Boyd's assertions and the resulting injury to his arm, the record reveals that the officers did not use excessive force but rather they used force in an effort to gain Boyd's compliance.

When Boyd placed his arms out of the cell trap door so his handcuffs could be removed, defendant Schouten directed him to keep his hands outside the trap until the handcuffs were removed. It is undisputed that Boyd pulled his right hand into his cell after the right cuff was removed, in direct violation of Schouten's order to keep both hands out until the handcuffs were removed. The plaintiff's refusal to follow orders necessitated action on the part of the defendants.

It is well-established that prisoners must follow orders.

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476-77 (7th Cir. 2009) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1266-67 (7th Cir. 1984)). "When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force." *Soto*, 744 F.2d at 1267.

Here, the parties describe the defendants' actions to gain Boyd's compliance differently—the defendants assert that defendant Kaphingst applied a compliance hold on the plaintiff's left wrist and secured his left arm while the plaintiff asserts that defendant Kaphingst violently yanked on his left arm and Kaphingst, Schouten, and Budler-Ronzoni descended on it "like a pack of wolves."

However, even assuming that the defendants acted as described by Boyd, their use of force was an attempt to restore discipline and not a malicious or sadistic attempt to cause harm. Boyd had just refused a direct order and minutes previously he had refused several other direct orders. In addition, Boyd has an extensive disciplinary history, with seven conduct reports in 2012 prior to the October 27 incident. Pulling his right arm into his cell was an act of resistance and the defendants quickly used the necessary force to regain Boyd's compliance. That force was not excessive under the Eighth Amendment, and I will grant the defendants' motion for summary judgment as to Boyd's excessive force claim. Accordingly, Boyd's failure to intervene claim fails because no underlying claim remains. *See Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004).

  *2.  Conditions of Confinement Claim*

  Prison officials violate the Eighth Amendment if they are deliberately indifferent to adverse conditions that deny "the minimal civilized measure of life's necessities," *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (citation omitted), including adequate sanitation and personal hygiene items, *see Rice v. Correctional Medical Servs.,* 675 F.3d 650, 664 (7th Cir. 2012); *Gillis v. Litscher,* 468 F.3d 488, 493 (7th Cir. 2006); *Vinning–El v. Long,* 482 F.3d 923, 924 (7th Cir. 2007). In addition, prisons must meet minimal standards of habitability. This includes adequate bedding and protection from cold. *See Gillis,* 468 F.3d at 493; *Dixon v. Godinez,* 114 F.3d 640, 643 (7th Cir. 1997); *Antonelli v. Sheahan,* 81 F.3d 1422, 1433 (7th Cir. 1996); *Lewis v. Lane,* 816 F.2d 1165, 1171 (7th Cir. 1987).

  Here, Boyd challenges his conditions for the time that he was on control status, when his property was limited to a segregation smock and a mattress. He asserts that "they confiscated all my property, cut and ripped the state uniform from my body, took away the state issued bed, sheets and blankets, and forced me to live nude in an uncleaned control-observation cell[.]" (Pl.'s Mot. for

Summ. J., Docket 32, at 2.) According to Boyd, while confined nude on control status, his feet were numb from the cold, concrete floor and he continually paced back and forth, which caused him unbearable back pain. Although Boyd asserts that his cell was dirty, he asserts that prisons, and especially prison floors, are generally filthy.

The record reveals that Boyd was placed on observation on October 27, 2012, from 8:30 a.m. until 3:04 p.m., approximately 6 and a half hours, and that his property was limited based on his assaultive behavior and extreme agitation. During that time, he was offered lunch. The temperature in his cell ranged between 69.91 and 72.77 degrees Fahrenheit. At 3:04 p.m., Boyd was removed from controlled status and his clothing and personal items were returned to him. Finally, it is undisputed that at 3:00 p.m., four minutes before he was removed from controlled segregation, Boyd reported that he was "fine."

On this record, Boyd has not demonstrated that he was denied the minimal civilized measure of life's necessities or that defendant Schneider acted with deliberate indifference. Boyd was limited to a segregation smock and mattress for six and one half hours for security reasons. His cell was not cold and he was offered food. Thus, the defendants' motion for summary judgment as to Boyd's conditions of confinement claim will be granted.

  3. *Medical Care Claim*

A prisoner's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011). Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Id.* at 751. Delaying treatment may constitute deliberate indifference if such delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th

Cir. 2010) (*Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976)). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox Cnty. Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012).

Boyd's medical care claim is based on allegations that defendant Schneider placed him in controlled segregation after the incident on October 27, 2012, instead of providing him with medical care for his injuries. However, the record reveals that Nurse Slinger evaluated and treated Boyd after the incident. His left arm was cleansed and bandaged, and he received pain medication. The following day, Nurse DeYoung conducted a follow-up evaluation of Boyd's injuries. On this record, Boyd's medical care claim fails.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiff's motion for summary judgment (Docket # 25) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket # 32) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket # 39) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of March, 2014.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge